1

2

3

4

5

6

7

8             **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   LLOYD CLINT EDWARDS,              No. CIV S-05-0338-LKK-CMK-P

12              Petitioner,

13        vs.                          FINDINGS AND RECOMMENDATIONS

14   A.K. SCRIBNER,

15              Respondent.

16   _____/

17             Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the court are petitioner's petition

19   for a writ of habeas corpus (Doc. 1), filed on February 22, 2005, and respondent's answer (Doc.

20   14), filed on July 11, 2005.  Petitioner has not filed a traverse.

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

1

# I. BACKGROUND

## A.   Facts[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct.  The state court first outlined the events of August 16, 2000:

> On the evening of August 16, 2000, T.F. and her friend, A.R., encountered defendant at a convenience market.  Defendant said his car was broken down and asked for a ride.  T.F. and A.R. agreed and took defendant to a nearby apartment complex.  Defendant went into the complex but came out shortly thereafter and said his friend was not home. He asked for a ride to another location, and the young women agreed.
>
> As T.F. drove toward defendant's new destination, he put his arm around A.R.'s neck and held a gun to her side.  He ordered T.F. to drive onto the freeway, then reached forward and took the women's purses, and began going through them.  He threw some of their things out of the car window and demanded their identification cards.
>
> Eventually, defendant directed T.F. to turn onto a rural road.  A little way down the road, he told T.F. to stop.  He then ordered A.R. out of the car, telling her to sit on the side of the road until he came back.  He warned her that if she moved he would shoot T.F.
>
> Defendant climbed into the front seat and ordered T.F. to drive further down the road.  As she drove, defendant pointed the gun at her while he reached over and made sexual penetration with his fingers.  A little way down the road, defendant ordered T.F. to stop, disrobe, and engage in sexual intercourse with him.  She complied.
>
> When T.F. began driving again, defendant threw more of her things, including her cigarettes, out the window.  He told her that smoking was bad for her and said this was her lesson for picking up strangers. When they did not quickly find A.R., defendant became angry and ordered T.F. to drive back to town.  He directed her to an apartment complex and told her to park in the back.  He demanded her car keys, watch, and the rings she was wearing.  He gathered up the purses and other things. Before leaving, he told T.F. that he had the women's driver's licenses so he knew where they lived if they were to do anything stupid.
>
> T.F. went to the front of the apartment complex and enlisted the aid of F.M., who took T.F. to the home of her friend, R.P.  The three then went out and found A.R., still sitting where she had been left.  They returned to R.P.'s house.  The victim, T.F., did not know what to do, so she called her mother, who told her to go back to her car and call the

---

[1]       Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as "defendant."

1    police.  T.F. did so.

2    The court then outlined the events of September 5, 2000:

3              The second incident involved in these proceedings occurred on
      September 5, 2000.  That evening, K.D. arrived home from shopping and
4    saw defendant knocking on the door of her neighbor across the hall.  When
      the knock was not answered, defendant asked to use K.D.'s telephone.
5              Defendant attempted to make a call and then kicked K.D.'s door
      shut.  He grabbed her into the bedroom.  He tried to kiss her but she turned
6    away.  He forced her to the floor and got on top of her.  K.D. realized she
      was going to be raped so she attempted to talk defendant out of his plan by
7    referring to her religious beliefs.  That did not work so she fought back.
      During the affray, she was punched, choked, and cut with a razor.  He
8    stopped the attack and said he was sorry.  Defendant eventually left but,
      before doing so, took K.D.'s telephone with him.

9

10   Finally, the court outlined the defense case:

11             Defendant testified as follows:

12             The incident with T.F. and A.R. started when they asked him to
      help them acquire marijuana.  He agreed and the women drove him to an
13   apartment complex where he obtained $60 worth of marijuana on credit.
      They drove for a while so they could share some of the marijuana.
14   Defendant told T.F. to turn off the freeway when he noticed the car
      swerving.
15             As the group drove down a rural road, A.R. said she felt sick.  So
      they stopped to let her out of the car.  Defendant got into the front seat,
16   and he and T.F. began flirting and fondling each other.  They told A.R. to
      wait where she was and drove further down the road to engage in
17   consensual intercourse.
               When T.F. and defendant returned to pick up A.R., they did not
18   immediately find her.  T.F. realized she was extremely low on gas, so they
      went back to town.  After getting gas, T.F. said she would go back for
19   A.R. alone.  She was supposed to give defendant $60 for the marijuana but
      she only had $40.  She gave defendant her two rings to hold and said she
20   would return with the rest of the money after picking up A.R.  However,
      she did not come back.
21             With respect to the second incident, defendant said that when he
      asked to use K.D.'s telephone, she refused and used a racial epithet.  He
22   became angry and struck her.  K.D. reached for her telephone, and
      defendant tried to take it away from her.  Their momentum took them
23   down the hall and into the bedroom, where they fell onto the floor with
      defendant on top of K.D.  K.D.'s injuries occurred as they struggled for the
24   telephone.  Eventually, defendant regained composure and apologized.
      However, when he left, he took the telephone with him because he was
25   still upset by the racial epithet.

26

                                        3

As to T.F.'s rings, the state court noted that the prosecution established that defendant sold them at a local pawn shop about two weeks following the incident.

### B.   Procedural History

Petitioner was convicted of nine counts as follows:  (1) three counts of aggravated kidnapping; (2) one count of rape; (3) one count of sexual penetration with a foreign object; (4) two counts of second degree robbery; (5) one count of first degree residential robbery; and (6) one count of assault with the intent to commit rape.  As to the first degree residential robbery and assault with intent to commit rape counts, the jury found true that petitioner had personally used a dangerous weapon.  As to all other counts, the jury found true that petitioner had personally used a firearm.  Petitioner was sentenced to a determinate term of 51 years and four months, to run consecutive to three life terms.  On direct appeal, the California Court of Appeal affirmed the convictions in a decision issued on September 9, 2003.  The court modified the sentence as to theft fines, but otherwise affirmed the sentence.  The California Supreme Court denied direct review on November 19, 2003, without comment or citation.


## II.  STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208

1   (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

2   perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

3   evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

4   petition de novo where state court had issued a ruling on the merits of a related claim, but not the

5   claim alleged by petitioner).  When the state court does not reach the merits of a claim,

6   "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

7          Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

8   not available for any claim decided on the merits in state court proceedings unless the state

9   court's adjudication of the claim:

10                 (1) resulted in a decision that was contrary to, or involved an
                   unreasonable application of, clearly established Federal law, as determined
11                 by the Supreme Court of the United States; or

12                 (2) resulted in a decision that was based on an unreasonable
                   determination of the facts in light of the evidence presented in the State
13                 court proceeding.

14   28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

15   Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

16          Under § 2254(d), federal habeas relief is available where the state court's decision

17   is "contrary to" or represents an "unreasonable application of" clearly established law.  In

18   Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the

19   Court), the United States Supreme Court explained these different standards.  A state court

20   decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme

21   Court on the same question of law, or if the state court decides the case differently than the

22   Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state court

23   decision is also "contrary to" established law if it applies a rule which contradicts the governing

24   law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate that

25   Supreme Court precedent requires a contrary outcome because the state court applied the wrong

26   legal rules.  Thus, a state court decision applying the correct legal rule from Supreme Court cases

1   to the facts of a particular case is not reviewed under the "contrary to" standard.  See id. at 406.

2   If a state court decision is "contrary to" clearly established law, it is reviewed to determine first

3   whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040, 1052 n.6 (9th

4   Cir. 2002).  If so, the next question is whether such error was structural, in which case federal

5   habeas relief is warranted.  See id.  If the error was not structural, the final question is whether

6   the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

7           State court decisions are reviewed under the far more deferential "unreasonable

8   application of" standard where it identifies the correct legal rule from Supreme Court cases, but

9   unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith,

10  123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams,

11  suggested that federal habeas relief may be available under this standard where the state court

12  either unreasonably extends a legal principle to a new context where it should not apply, or

13  unreasonably refuses to extend that principle to a new context where it should apply.  See

14  Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

15  decision is not an "unreasonable application of" controlling law simply because it is an erroneous

16  or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 123 S.Ct.

17  1166, 1175 (2003).  An "unreasonable application of" controlling law cannot necessarily be

18  found even where the federal habeas court concludes that the state court decision is clearly

19  erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear error fails to

20  give proper deference to state courts by conflating error (even clear error) with

21  unreasonableness."  Id.  As with state court decisions which are "contrary to" established federal

22  law, where a state court decision is an "unreasonable application of" controlling law, federal

23  habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn,

24  283 F.3d at 1052 n.6.

25  / / /

26  / / /

1    The "unreasonable application of" standard also applies where the state court

2  denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

3  848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions

4  are considered adjudications on the merits and are, therefore, entitled to deference under the

5  AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

6  The federal habeas court assumes that state court applied the correct law and analyzes whether

7  the state court's summary denial was based on an objectively unreasonable application of that

8  law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

9

10                              **III.  DISCUSSION**

11          Petitioner raises the following three claims:

12      1.      An actual conflict of interest adversely affected counsel's performance at
                trial and deprived petitioner of his constitutional right to the effective
13              assistance of counsel; . . . an actual conflict of interest prevented defense
                counsel from cross-examining his former client [T.F.] about marijuana
14              cultivation at her residence;

15      2.      The joinder of the offenses at trial resulted in such gross unfairness as to
                deny [petitioner's] due process right to a fair trial. . . .; evidence of the
16              [T.F.] incident was far from overwhelming and the people's case was
                clearly strengthened by a prejudicial spillover effect from a stronger to a
17              weaker case; and

18      3.      The failure to specify the [California Penal Code] section 12022.53,
                subdivision (b) enhancement [in the charging information] resulted in an
19              unauthorized sentence in violation of . . . [due process].

20   **A.      Conflict of Interest**

21          As to this claim, the state court held:

22              Defendant contends the judgment must be reversed because his
            trial counsel had an actual conflict of interest that adversely affected
23          counsel's performance.
                The issue arose during the trial when defense counsel advised the
24          court that, on the first day of trial, it came to light that he had been
            appointed to represent victim T.F. on a matter in 1998.  Counsel said that
25          T.F. had been charged with cultivation of marijuana.  The charge was
            dismissed because of the prosecution's belief that T.F. knew nothing about
26          the marijuana that was being grown in a closet in the residence she shared

                                         7

1   with another person.  T.F. denied any knowledge of what was occurring in
    the house.

2           The court inquired whether counsel learned anything of T.F.'s
    personal use of marijuana.  Counsel replied he had no memory of it and

3   nothing was reflected in his notes.  Counsel said that, other than the fact
    his name appeared on the docket as having been appointed to represent

4   T.F. at one time, he saw no conflict of interest.  He had discussed the
    matter with defendant, who wanted counsel to continue to represent him.

5   Defendant confirmed that this was so.  The court said:  "As long as you
    made a disclosure, I see no problem."

6

7   The state court then noted that, under California law, a defendant may waive his right to counsel

8   free of an actual conflict, but did not decide whether such a waiver was valid in this case because

9   it found no basis for concluding that a conflict existed or that, if one existed, it affected counsel's

10  performance.  The state court continued:

11          The right to effective assistance of counsel includes the right to
    representation that is free from conflicts of interest.  (citation omitted).

12  Under federal constitutional principles, reversal of a judgment requires the
    defendant to demonstrate that an actual conflict of interest adversely

13  affected his counsel's performance.  (Cuyler v. Sullivan (1980) 446 U.S.
    335, 350).  Under our state Constitution, it is sufficient that the defendant

14  demonstrate a potential conflict and an "informed speculation" that the
    asserted conflict adversely affected counsel's performance.  (citation

15  omitted).  An informed speculation cannot be made up out of whole cloth;
    rather, it must be grounded on a factual basis that can be found in the

16  record.  (citation omitted).  The determination whether counsel's
    performance was adversely affected requires inquiry into whether counsel

17  "pulled his punches," that is, whether counsel failed to represent the
    defendant as vigorously as he might have in the absence of a conflict.

18  (citation omitted).

19  On the facts of this case, the state court concluded:

20          We find no basis for reversal on the record presented in this case.
    In order to find even a potential conflict, we would be compelled to reject

21  the trial court's determination that counsel was truthful when he stated he
    had no confidential information, and instead conclude for ourselves that

22  counsel was lying.  In the absence of evidence in the record that counsel in
    fact had confidential information arising from his prior representation of

23  T.F., we can do neither.  (citation omitted).

24          In any event, we have reviewed the record and find no basis for
    concluding that defense counsel "pulled his punches."  Counsel vigorously
    cross-examined T.F.  He asked her, A.R., and other witnessed focused

25  questions designed to give the jury at least a speculative basis for believing
    that marijuana was involved in the incident.  During argument, counsel

26  vigorously challenged T.F.'s credibility.  His argument came close to an

8

attempt to ridicule her denial that marijuana was involved in the incident. The forcefulness of counsel's representation leaves no room for an informed speculation that counsel failed to represent defendant as vigorously as he might have but for his prior relationship with T.F.

Defendant argues, however, that the marijuana issue was of critical importance to the defense case in view of his claim that the incident involved marijuana and T.F.'s assertion that she quit using marijuana before the incident. In this light, according to defendant, counsel's failure to bring out information concerning T.F.'s arrest in 1998 demonstrates that he pulled his punches.

In a footnote, the state court observed:

Shortly after the incident, an investigating police officer asked T.F. whether drugs were involved. T.F. said that both she and A.R. had quit using marijuana about three and one-half years earlier. At trial, T.F. denied that marijuana was involved in the incident and said she had not used marijuana in five or six years.

The state court continued:

The mere fact that in 1998 a criminal charge against T.F. was made and then dismissed would not be admissible to impeach her testimony in this case. (citation omitted). If defense counsel had information or evidence concerning T.F.'s personal use of marijuana that would contradict her testimony in any relevant part, then it would be a proper subject of inquiry. (citation omitted). But counsel expressly advised the court that he had obtained no such information in his prior representation of T.F. We will not reject counsel's disclaimer and the trial court's acceptance of it.

In Cuyler v. Sullivan, the Supreme Court considered a claim based on an alleged conflict of interest with counsel. See 446 U.S. 335 (1979). In Cuyler, the Court considered, among other things, the following question: "[W]hether the mere possibility of a conflict of interest warrants the conclusion that the defendant was deprived of his right to counsel." Id. at 345. The court held that, to prevail on such a claim, the petitioner would have to show that ". . . an actual conflict of interest adversely affected his lawyer's performance." Id. at 348. The Court noted that, at least in cases involving a conflict arising from multiple representation, ". . . a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." Id. at 349-50. In

/ / /

9

1    remanding for further proceedings, the Supreme Court made its holding clear:

2              The Court of Appeals granted Sullivan relief because he had shown that
3         the multiple representation in this case involved a possible conflict of
          interest.  We hold that the possibility of conflict is insufficient to impugn a
          criminal conviction.  In order to demonstrate a violation of his Sixth
4         Amendment rights, a defendant must establish that an actual conflict of
          interest adversely affected his lawyer's performance. . . .  Since the Court
5         of Appeals did not weigh [the] conflicting contentions under the proper
          legal standard, its judgment is vacated and the case is remanded for further
6         proceedings consistent with this opinion.

7    Id. at 350.

8              In Bonin v. Calderon, the Ninth Circuit applied the Cuyler test to the petitioner's

9    claim that "[h]e was denied effective assistance of counsel . . . because his trial attorney suffered

10   from a conflict of interest."  59 F.3d 815, 823 (9th Cir. 1995).   The Ninth Circuit described the

11   alleged conflict as follows:

12             . . . Bonin asserts that he and [his trial attorney, William Charvet],  had
          entered into a literary rights agreement before Charvet became his trial
13        attorney, and that the existence of the literary rights agreement gave
          Charvet an incentive, subsequent to his retention, to maximize publicity
14        about the case rather than to represent Bonin effectively.  Bonin also
          alleges that Charvet agreed to represent him . . . in return for an additional
15        ten percent of the literary rights proceeds, and argues that a conflict of
          interest existed because Charvet had to pay for investigative costs out of
16        his own pocket.  Bonin further asserts that Charvet refused to call a
          potential witness, Dr. Lunde, at the penalty phase . . . because he feared
17        Dr. Lunde would reveal the literary rights agreement. . . .  [¶] The State
          maintained that . . . any arrangement had been terminated before Charvet
18        began representing Bonin. . . .

19   Id. at 824.

20   The Ninth Circuit began its analysis from the starting point that "[t]he Sixth Amendment right to

21   counsel includes the right to counsel of undivided loyalty."  Id. (citing Wood v. Georgia, 450

22   U.S. 261, 272 (1981)).  Applying the Cuyler test, the court rejected Bonin's claims based on the

23   alleged conflict because it concluded that no actual conflict existed.  See id. at 827.

24   / / /

25   / / /

26   / / /

1    In Rich v. Calderon, a capital case in which the petitioner was represented at the

2    trial level by the Shasta County Public Defender's Office, the Ninth Circuit addressed the

3    question of an economic conflict allegedly arising from funding pressures.  See 187 F.3d 1064,

4    1069 (9th Cir. 1999).  In rejecting the petitioner's claim, the Ninth Circuit applied the Cuyler test

5    and held:

6         Rich claims that his trial counsel labored under an "economic conflict" of
          interest because of pressures put on him by Shasta County funding
7         authorities.  The result of these pressures, Rich claims, was twofold: (1)
          his counsel was "chilled" from obtaining experts "untainted" by a
8         confession that was ultimately suppressed; and (2) an investigator was not
          hired to look into jailhouse conditions and their impact on Rich.

9

          Even under the deferential standard the district court applied to this claim,
10        it fails because Rich cannot show that: (1) his counsel actively represented
          conflicting interests; and (2) an actual conflict of interest adversely
11        affected counsel's performance.  See [Bonin, 59 F.3d] at 825.  Rich's
          failure to make out such a prima facie case relieved the district court of
12        any responsibility to hold an evidentiary hearing on the claims.  (citation
          omitted).

13

          A claim that a conflict produced adverse impact is not made out by simply
14        claiming such; it must be an impact that significantly worsens the client's
          representation.  See United States v. Mett, 65 F.3d 1531, 1535-36 (9th Cir.
15        1995).  Rich's trial counsel provided an affidavit discussing the financial
          pressures he perceived at the time, which does not even suggest that he
16        gave in to those pressures in any way that produced demonstrable harm of
          any kind to Rich's defense.

17

          The finding below that Rich was denied the effective assistance of counsel
18        at trial is supported by substantial evidence.

19   Rich, 187 F.3d at 1069.

20        In Mickens v. Taylor, the Supreme Court revisited the conflict issue and clarified

21   its holding from Cuyler.  The Supreme Court stated that the general rule requiring a showing of

22   prejudice consistent with the standard set forth in the familiar Strickland standard still applies in

23   the conflict context and identified Cuyler as an exception to this general rule applicable in cases

24   of multiple representation.  See 535 U.S. 162, 176 (2002).  The Court characterized the

25   Strickland prejudice requirement as an additional element for a conflict claim not involving

26   multiple representation.  See id. at 174.  Therefore, under Cuyler, Bonin, and Rich, petitioner

11

1 must demonstrate that an actual conflict adversely affected counsel's performance.  Under

2 Mickens, petitioner must also demonstrate actual prejudice with respect to the outcome of the

3 trial.

4       It is clear from the state court's analysis that it applied the correct controlling legal

5 rules.  In fact, by looking for only a potential conflict and an "informed speculation" as to

6 adverse affect, the state court applied a test less stringent than the federal constitutional test,

7 which requires an actual conflict, actual adverse affect, and prejudice.  Therefore, the court will

8 review the state court's opinion to determine whether it is an "unreasonable application of"

9 federal constitutional principles.

10       As to whether there was an actual conflict, this court also sees no reason to

11 substitute its judgment for that of the state trial judge who concluded that petitioner's counsel

12 was truthful when he stated that he had no confidential information arising from his prior

13 representation of T.F.  Further, any evidence concerning T.F.'s 1998 arrest is not relevant

14 because, as the state court noted, it would not have been admissible under California law.

15 Petitioner has demonstrated no other factual basis to show a potential conflict of interest, let

16 alone an actual conflict.

17       The inadmissability of the 1998 arrest also indicates that there could have been no

18 adverse affect on counsel's performance as a result of his prior relationship with T.F.  In any

19 event, even if admitted, the 1998 arrest does not contradict T.F.'s testimony in this case that she

20 did not use marijuana and that marijuana was not involved in the incident.  As to the 1998 arrest,

21 T.F. had claimed that she knew nothing of the marijuana being cultivated in a house she shared

22 and the charges were subsequently dismissed.  Even if she had admitted to marijuana use in

23 1998, that would also be consistent with her testimony that she had quit using marijuana several

24 years before the incident in this case.  The court agrees with the state court that there was not

25 even "informed speculation" as to an adverse affect.  Certainly, petitioner has not demonstrated

26 an actual adverse affect, which would be required to prevail in a federal habeas case.

1    Because evidence concerning T.F.'s 1998 arrest – assuming it would have been

2  admissible – would not have undermined her trial testimony, the court also concludes that there

3  could have been no actual prejudice to petitioner but for counsel's failure to raise the 1998 arrest.

4    For the foregoing reasons, the court finds that the state court's adjudication of this

5  claim was not an unreasonable application of controlling federal constitutional principles.

6    **B.    Misjoinder**

7    Petitioner asserts that the trial court improperly joined the August 16, 2000,

8  incident involving T.F. and the September 5, 2000, incident involving K.D. in the same

9  proceeding.  According to petitioner, the prosecution's case as to the T.F. incident was weaker

10  and that the T.F. case was strengthened by being tried with the stronger K.D. case.  As to this

11  claim, the state court held:

12    The charges arising out of the incident that involved T.F. and A.R.
    and the charges arising out of the incident involving K.D. were originally
13    alleged in separate informations.  When the prosecutor moved to
    consolidate them, defendant objected without elaboration.  The motion
14    was granted.  At arraignment on the consolidated information, defendant
    specified his objection was that consolidation would create undue
15    prejudice and confusion of issues.  The court noted the objection but
    proceeded to trial of the consolidated cases.
16    On appeal, defendant contends that the joint trial resulted in such
    gross unfairness that he was deprived of a fair trial.

17

18  After outlining California law concerning consolidation of criminal matters, the state court

19  provided the following analysis of the facts of this case:

20    Defendant contends that consolidation resulted in the joinder of a
    relatively weak case with a relatively strong one.  He argues that the
21    charges arising out of the incident involving T.F. and A.R. presented a
    weak case and that joinder with the relatively strong case involving K.D.
22    had an improper spillover effect.
    We do not agree that the charges arising out of the first incident
23    presented a weak case; to the contrary, the evidence can fairly be called
    very strong.  The incident involved two victims, each of whom testified
24    and described defendant's behavior.  DNA analysis established that semen
    left in T.F.'s car was deposited by defendant.  About two weeks after the
25    incident, defendant sold T.F.'s rings at a local pawn shop.  Various
    witnesses who saw T.F. immediately after the event confirmed that she
26    immediately complained of rape and asked for help.  An investigating

13

officer saw and photographed the women's property strewn about the car as they had described.  When defendant was first interviewed by officers, his response was total denial.  He denied having any knowledge of T.F. and A.R.  He denied getting a ride from a convenience market with them.  He denied being in a car with any females in the relevant time period.  He denied being in a car that fit the description of T.F.'s car.  And he denied engaging in sexual acts with any young women during the relevant time period.  These statements were wholly inconsistent with the new and innocent version of the events defendant offered at trial.  And defendant could provide no logical reason that T.F. and A.R. would concoct a kidnapping, robbery, and rape story.

In order to obtain reversal, defendant would be required to clearly establish that a joint trial was so grossly unfair as to amount to a denial of due process.  (citations omitted).  The sole basis upon which he asserts unfairness is the claimed weakness of the evidence in the case that arose from the incident involving T.F. and the relative strength of the evidence in the case that arose from the incident involving K.D.  Our review of the record compels us to conclude that evidence of the first incident presented a rather strong case and that we do not perceive a significantly different strength of evidence as to the second incident.  Accordingly, we reject defendant's contention.

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not available for alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  Because federal habeas relief does not lie for state law errors, ". . . misjoinder would rise to the level of a constitutional violation only if it results in prejudice to great as to deny a defendant his Fifth Amendment right to a fair trial."  United States v. Lane, 474 U.S. 438, 446 n.8 (1986).  In order to raise such a

1   claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete

2   miscarriage of justice." Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396

3   F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).  The

4   Ninth Circuit has elaborated on this standard in the context of claims of misjoinder.  The federal

5   habeas court must decide whether ". . . the trial on a particular count was fundamentally unfair in

6   light of [the trial] court's joinder with one or more other charges." Park v. California, 202 F.3d

7   1146, 1149 (9th Cir. 2000).

8           The logic of the state court's analysis is beyond question.  The factual premise of

9   petitioner's misjoinder claim is that the T.F. case was weaker and was bolstered by the stronger

10  K.D. case.  This simply is not true.  As the state court recited:  (1) both T.F. and A.R.

11  corroborated each other's testimony; (2) defendant's initial denials to police were inconsistent

12  with the story he presented at trial; and (3) witnesses who saw T.F. immediately after the incident

13  testified that she complained of rape right away.  The court finds that, on this record, the T.F.

14  case was not weaker than the K.D. case, which involved only one victim, no other witnesses, and

15  less physical evidence.  Because the T.F. case was not weaker, there was no possibility of

16  prejudice as a result of consolidation.  The state court's adjudication was neither contrary to nor

17  an unreasonable application of the law.

18      **C.**      **Enhancement Under California Penal Code § 22022.53(b)**

19          As to petitioner's final claim raised in this petition, the state court held:

20          With respect to each of the seven offenses charged as a result of the
        incident involving T.F. and A.R., the information alleged defendant
21      personally used a firearm within the meaning of [California Penal Code]
        section 1203.06, subdivision (a)(1), and section 12022.5, subdivision
22      (a)(1).  The jury found true that defendant personally used a firearm in the
        commission of each of those offenses.  The trial court imposed sentence
23      enhancements pursuant to section 12022.53, reasoning that section
        12022.53 "preempts" section 12022.5 under the circumstances.
24          Section 12022.5, subdivision (a), provides for an enhancement of
        three, four, or ten years when a defendant personally uses a firearm in the
25      commission or attempted commission of a felony.  Section 12022.53,
        subdivision (b), states that a sentence must be enhanced by ten years when,
26      in the commission of certain specified felonies, a defendant personally

uses a firearm.  The crimes defendant committed against T.F. and A.R. are among the felonies specified in section 12022.53.  In such circumstances, section 12022.53, subdivision (b), applies "[n]otwithstanding any other provision of law."  (citation omitted).  When an enhancement specified in section 12022.53 has been admitted or found to be true, the court must impose sentence under that section rather than any other provision of law unless another provision of law provides a greater penalty or longer term of imprisonment.  (citation omitted).

Defendant contends that, because the information specified section 12022.5 as the basis for enhancements, the court erred in imposing sentence enhancements pursuant to section 12022.53.  We disagree.

For section 12022.53 to apply, "the existence of any fact required under subdivision (b), (c), or (d) shall be alleged in the information or indictment and either admitted by the defendant in open court or found to be true by the trier of fact."  (citation omitted).  What must be alleged and admitted or found to be true are the *facts* that bring the case within section 12022.53.  Here, the information charged the facts that brought the case within section 12022.53, and the jury found those facts to be true.  (emphasis in original).

Petitioner's argument is based on an alleged error in the application of state law.  Specifically, he asserts that the trial court erroneously imposed enhancements under California Penal Code § 12022.53 even though that statute had not been set forth in the information.  As discussed above, such a claim is only cognizable on federal habeas review if the error resulted in a violation of petitioner's due process right to a fair trial.  Thus, the first prerequisite for the claim to be cognizable is that there was an error of state law.  The court concludes that none occurred in this case.  As the state court observed, under California law, an enhancement is proper as long as the facts supporting the enhancement are alleged in the charging document and established either by admission or proof to the trier of fact.  Here, both occurred – the facts supporting imposition of the ten-year enhancements were alleged in the information and were found to be true by the jury.  As such, there was no error of state law.

/ / /

/ / /

/ / /

/ / /

/ / /

16

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1.      Petitioner's petition for a writ of habeas corpus be denied; and

2.      The Clerk of the Court be directed to enter judgment and close this file..

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


DATED:   September 13, 2007.


**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE